Jon A. Atabek, Esq. (SBN 269497)
(jatabek@atabeklaw.com)
ATABEK & ASSOCIATES, P.C.
16330 Bake Parkway
Irvine, CA 92618
T: 213.394.5943

Attorneys for Plaintiff
VELARO, INC.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VELARO, INC., a Maryland corporation,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL FLOOD SERVICES, LLC, a Delaware limited liability company; PEAK6 GROUP, LLC, a Delaware limited liability company; and Does 1-10,<br><br>Defendants. | Case No. 2:20-cv-05078-DMG-PD<br><br>**COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF FOR:**<br><br>1. **BREACH OF CONTRACT;**<br>2. **ACCOUNT STATED;**<br>3. **SERVICES RENDERED;**<br>4. **CONSTRUCTIVE FRAUD;**<br>5. **AIDING AND ABETTING CONSTRUCTIVE FRAUD;**<br>6. **COPYRIGHT INFRINGEMENT**<br>7. **DECLARATORY RELIEF.**<br><br>**<u>JURY DEMANDED</u>** |

Plaintiff VELARO, INC. by and through its attorneys of record, respectfully submits the following Complaint against Defendants NATIONAL FLOOD SERVICES, LLC, PEAK6 GROUP, LLC, and Does 1 – 10, and alleges as follows:

## INTRODUCTION

1. Defendant NATIONAL FLOOD SERVICES, LLC ("NFS"), through its predecessor entity AON National Flood Services, Inc. ("AON NFS"), purchased a license for live-chat and visitor monitoring software and services from Plaintiff VELARO, INC. ("Plaintiff" or "Velaro") pursuant to a written contract. The service allows Velaro's clients to monitor visitors to its website, live, and cause instant message windows to pop open to chat with visitors in real time. The contract included a three-year term, discount pricing for 30 (and later 35) users, and auto-renewal terms. NFS, without Velaro's knowledge, added at least 30 more users than what they were paying for, and began to install and implement Velaro's script and services on the websites of NFS's clients, in violation of the terms of their license.

2. Defendant PEAK6 GROUP LLC ("Peak6"), through its predecessor entity Peak6 Investments, L.P. ("Peak6, LP"), later acquired NFS. Fully aware of the auto-renewal terms, Peak6 allowed the contract to auto-renew, continued to use the software, then repudiated the contract several months later through Peak6's in-house counsel. Peak6 took the position that the contract did not auto renew, and refused to pay sums owed pursuant to the contract.

3. During this time, Peak6 represented to Velaro that it wanted to work out a "deal" regarding their repudiation. This turned out to be a ruse, designed to buy time while NFS and Peak6 launched their "Trident" platform, and migrated 50 of its 65 users off Velaro's live-chat system. Velaro believes NFS and Peak6 have plagiarized portions of Velaro's code and script, and incorporated it into Trident. And even after launching Trident, NFS and Peak6 kept 15 of their agents on Velaro's system, *while asserting their own license was expired*.

4. Eventually, Velaro terminated Peak6's service. However, as of the filing of this action, NFS and Peak6 had not removed Velaro's JavaScript from their website, or from the websites of their clients, in violation of and exceeding the scope of their now terminated licenses, thereby infringing on Velaro's copyrights.

5. One way or another, NFS and/or Peak6 must pay Velaro for its use (and misuse) of Velaro's software services, either pursuant to the terms of the written contracts, tort law, or copyright law. If the contract auto-renewed, they are liable for contract damages for the auto-renewed term. If the contract did not auto-renew, and NFS and Peak6 knowingly used the software without a license, then NFS and Peak6 knowingly infringed on Velaro's copyrights, and must pay full price for their use and/or disgorge profits derived from its use. And, regardless, NFS and/or Peak6 are legally liable to Velaro to pay for their other unauthorized use of the software services, and for their other tortious acts.

## PARTIES

6. Plaintiff Velaro is a Maryland corporation with its principal place of business in Los Angeles County, California.

7. Defendant NFS is a Delaware corporation. Plaintiff is informed and believes NFS's principal place of business is in Flathead County, Montana. NFS is the successor to AON NFS, and the two are referred to interchangeably herein.

8. Defendant Peak6 is a Delaware limited liability company, with its principal place of business in the City of Chicago, Cook County, Illinois.

9. Plaintiff does not know the true names of defendants DOES 1 through 10, inclusive, and therefore sues them by those fictitious names. Plaintiff is informed and believes, and on the basis of that information and belief alleges, that each of those defendants was in some manner intentionally and proximately responsible for the events and happenings alleged in this Complaint and for Plaintiff's injuries and damages.

10. Plaintiff is informed and believes, and based on this information and belief alleges, that at all times mentioned in this Complaint, Defendants were the agents and employees of their codefendants and/or co-conspirators, and in doing the things alleged in this complaint were acting within the course and scope of such agency, employment, and/or conspiracy.

11. Hereafter, references to Defendants shall be deemed to include all named Defendants, unless otherwise indicated.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over the claims brought under federal law pursuant to 28 U.S.C. §§ 1331 and 1338, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332. Through the same actions and omissions that form the basis of Plaintiff's federal claims, Defendants have also violated Plaintiff's rights under state law, over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

13. This Court has personal jurisdiction over the claims brought herein, because Defendants committed tortious acts that were purposefully directed to Plaintiff, who Defendants knew to be located in California, and because the applicable contract between the parties has choice of law and forum selection provisions designating California as the proper forum for this action.

14. Venue over Plaintiff's claims is proper in the Central District of California because Plaintiff resides in the Central District of California within the meaning of 28 U.S.C. § 1391, because the events, acts, and omissions giving rise to Plaintiff's claims occurred in the Central District of California, and because the applicable contract between the parties at issue here selects the venue for any dispute as Los Angeles, California.

## FACTS APPLICABLE TO ALL CLAIMS

**A. Velaro's Business Model**

15. Velaro's live-chat and traffic monitoring services are data intensive and require significant allocations of traffic/server space. Velaro offers significant discounts to its clients when they commit to a certain number of users for a certain number of years, because it, in turn, allows Velaro to obtain deep discounts on things like online storage and bandwidth for the services from their own vendors by committing to larger volumes and longer terms, and pass the savings on to its

clients. If clients purport to terminate early, Velaro is still stuck paying for the infrastructure upgrades purchased on behalf of the client.

16. Additionally, the customer service and consulting elements of Velaro's services require significant staffing commitments. Some of Velaro's employees are staffed by only one or two clients, to ensure their availability. Again, if Velaro's clients terminate early, Velaro is still stuck paying those personnel.

17. Because of those long-term expenditures, Velaro does not permit its clients to prorate a long-term contract at termination.

### B. The Applicable Contracts

18. On or about January 31, 2014, Plaintiff Velaro and Defendant NFS executed that "Live Chat Agreement" with an effective date of January 31, 2014 (the "Agreement"). The Agreement sets forth agreed-upon discounted pricing based on the volume of user licenses and number of years purchased by NFS, for a price of $97,151.40 for three years. The Agreement also states that one of the discounts, in the amount of $64,789.20, was "In acceptance of the Velaro standard terms and conditions and upon executing the agreement by 1/31/2014." The Agreement also references feedback services from Velaro included with the package, including "Success Management" and "Customer Support" offered by Velaro. Additionally, the Agreement states that the proposal "is valid through the date(s) stated in the Pricing section," that either party may terminate within thirty days of a failure to cure a breach, that it becomes effective on the last signature date, and that NFS "must provide 30 days written notice [of cancellation] before account renewal." Finally, the Agreement states that upon cancellation, NFS "will not be pro-rated . . . any monies owed for remainder of the term of service." While the Agreement does reference "license fees," it does not state the terms upon which any license is granted to NFS, or expressly grant a license to Plaintiff's copyrights. A true and correct copy of the Agreement is attached hereto as <u>Exhibit 1</u>.

/ / /

19. In addition to the Agreement, the first time a user of the license logs in, and each time the terms and conditions are updated, Velaro requires that each user for each of its clients (including NFS) review and check a box to state "I ACCEPT" the terms of the "VELARO INCORPORATED ONLINE SOFTWARE LICENSE AGREEMENT" ("License Agreement" or "Click Through Agreement"). Section 1 of the most recent License Agreement that NFS has accepted expressly grants the user a license for "one electronic copy of the . . . services accessed via a web browser, and related documentation . . . . including without limitation copyrights," and is restricted to "internal use" only, and states NFS "may not . . . sell or derive any profit from . . . distribution or installation" of copies of the software.  Section 2 of the License Agreement also forbids creation of derivative works. Section 3 of the License Agreement expressly contemplates and incorporates any "separate negotiated signed contract connected to these terms" executed by the parties, and again references auto-renewal absent termination "not less than thirty (30) days prior written notice," and that NFS will remove all of Velaro's HTML, Java, and web script from its applicable websites. Section 6 includes choice of law and forum selection clauses designating California. Section 9 of the License Agreement includes an integration clause that states that the License Agreement is the "entire agreement between the parties with respect to the use of the Software and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter." A true and correct copy of the most recent version of the License Agreement executed by NFS as of the filing of this lawsuit is attached hereto as Exhibit 2.

**C. Performance on the Contracts**

20. On or about January 31, 2014, Velaro transmitted its first invoice to NFS, numbered 26448 ("Inv. 26448"), which set forth the entire amount due for the first year of service, in the amount of $32,383.30, and explicitly references the discounted rate based on the minimum number of 30 users, and NFS's "36 month

5

term commitment." A true and correct copy of the first invoice is attached hereto as Exhibit 3.

21. NFS timely paid Inv. 26448.

22. Shortly thereafter, Velaro assisted NFS in integrating its live-chat software into NFS's website, and NFS started using the live-chat software.

23. When NFS's agents first logged onto the system, and each and every time the License Agreement was updated, each of NFS's agents checked the box to accept the terms and conditions of the License Agreement at log-in.

24. In May of 2014, NFS asked to upgrade their account to add five users. NFS added those five users and billed NFS for the upgrade from June 1, 2014, through the end of the year.

25. At the end of the first year, on or about December 31, 2014, Velaro transmitted Invoice No. 27243 ("Inv. 27243"), reflecting that the number of users had increased to 35, that $38,380.80 was due in one month, and again referencing the discounted rate in exchange for a 36 month term commitment. A true and correct copy of Inv. 27243 is attached hereto as Exhibit 4.

26. NFS timely paid Inv. 27243.

27. Sometime in or around the second year of service, NFS, without Velaro's knowledge or consent, began adding more users to Velaro's system.

28. NFS paid for years two and three of the Agreement.

**D. The First Auto-Renewal**

29. Around the end of the third year, with auto-renewal coming up, NFS prepaid service for the year 2017, delivering $38,380.80 to Velaro.

30. Accordingly, on or about December 31, 2016, Velaro transmitted Invoice No. 37857 ("Inv. 37857"), reflecting the agreed-upon 35 users and $38,380.80 already paid for the next year, and again referencing the discounted rate in exchange for a 36-month term commitment. A true and correct copy of Inv. 37857 is attached hereto as Exhibit 5.

31. Velaro has recently discovered that during this time period, NFS installed Velaro's script in the websites of several of its own clients, allowing those third parties access to and use of Velaro's services, all without Velaro's knowledge.

32. Velaro also prepaid service for 2018.

### E. Peak6 Acquires NFS

33. Around the summer of 2018, Peak6 and its affiliates acquired NFS.

34. Peak6 took an active role in the day-to-day management of NFS, with Peak6 employees taking active roles in managing software licensing—including the relationship between Velaro and NFS.

35. By September, 2018, NFS had sixty users on the Velaro platform.

36. NFS and Peak6 continued to add unauthorized users onto the platform through November 27, 2018.

37. As January of 2019 approached, NFS pre-paid the upcoming year again. This time, it was their third year of their second successive three-year term, in the amount of $38,380.80.

38. Accordingly, on or about January 31, 2019, Velaro transmitted Invoice No. 5976 ("Inv. 5976"), reflecting the agreed-upon 35 users and $38,380.80 already paid for the next year. Inv. 5976 also stated, "Please Note: Subscription cancelation requires written notice 30 days prior to auto-renewal of subscription." A true and correct copy of Inv. 5976 is attached hereto as Exhibit 6.

### F. The Second Auto-Renewal

39. On February 6, 2019, NFS's "product owner" David Warkins reached out to Velaro, stating:

> I am going through the process with our new owners to submit the invoice for this year. Two questions back from them is about the current agreement in auto renewal. Is there any other terms that apply? Nothing separate or master terms that this rolls up to? Also, we can term the auto renewal next year with a new service agreement?

To which Velaro's Rustin Grant replied:

7

FIRST AMENDED COMPLAINT
(Case No.: 2:20-CV-05078-DMG-PD)

> I've attached a copy of your current contract. You are currently in the 3rd year of your agreement and your contract will auto-renew on 12/31/19.
>
> Our online agreement is located here: https://app.velaro.com/account/terms.
>
> Where these terms differ, your attached agreement will supersede.
>
> I can put you in touch with an account manager if you would like to consider a new service agreement.

40. NFS did not follow up to renegotiate the Agreement or License Agreement.

41. Instead, on October 14, 2019, shortly before the contracts auto-renewed, NFS stated "Peak6 would like to look at contracts fresh when they come up for renewal rather than have them auto renew. Who do I need to contact at Velaro to stop our current contract from auto renewing next year?"

42. Velaro responded by detailing the procedure, and discussing the pros and cons of doing so, as well as some of the proposed terms and ideas that might be incorporated into a new master agreement. Velaro finished by stating, "I'm here to serve you and will do as you wish, so please let me know if minimally you would like me to submit a cancellation."

43. NFS did not follow up or submit a cancellation. Accordingly, on January 31, 2020, the Agreement auto-renewed for another three years.

44. That same day, Velaro issued Invoice No. 70727 ("Inv. 70727") in the amount of $38,380.80 for the following twelve-month period, due in 30 days. A true and correct copy of Inv. 70727 is attached hereto as Exhibit 7.

**G. NFS/Peak6 Repudiate the Contract and Refuse to Pay**

45. Two weeks later, on or about February 14, 2020, Colleen Rozanski, who held the title of "Director, Agent Development" with NFS, but who was an employee of Peak6, reached out to Velaro to discuss renewal of the contracts.

46. Over the next few weeks, Velaro made repeated efforts to set a call, but NFS kept rescheduling.

47. In the meantime, in addition to the automatic invoice reminders Velaro sent out, Velaro staff personally inquired regarding the unpaid Inv. 70727, but received no response.

48. On March 9, 2020, Velaro and NFS finally had a phone call to discuss the contract. During this call, NFS stated that they wanted to downgrade their package to 15 users without a three year commitment, but did not want to lose their discounts. In response, Velaro checked NFS's usage, then discovered and pointed out that Velaro actually had 65 users set up—30 more than NFS was paying for. Velaro ultimately offered to drop NFS down to 30 users without losing their discounts, or give 15 users, but increase the term to 6 years. NFS refused. Velaro ultimately pointed out that they had already invoiced NFS for the upcoming three year term, but that they were still willing to negotiate as a courtesy. NFS left off the conversation by saying they had to speak internally.

49. On March 19, 2020, Velaro staff followed up again regarding payment on Inv. 70727, but received no response.

50. On March 25, 2020, Velaro staff followed up yet again on Inv. 70727.

51. Finally, on March 25, 2020, NFS responded by asking for pricing on a one year term for fifteen users. NFS finished with "Our General Counsel had the chance to review our contract and feels that we have some room to negotiate."

52. On March 30, 2020, Velaro responded by re-affirming and memorializing their prior conversation, wherein Velaro pointed out that the contract had already auto-renewed. Velaro also stated that a one year price for 15 users for one year comes out to approximately the same as 30 users with a three year commitment. Velaro again responded by asking about Inv. 70727.

53. Starting March 30, 2020, and through April 10, 2020, NFS began removing users from Velaro's system, ultimately removing 55 users.

54. On April 9, 2020, the parties spoke again by telephone. During that call, NFS/Peak6 asserted they did not believe the Agreement had auto-renewed.

9

FIRST AMENDED COMPLAINT
(Case No.: 2:20-CV-05078-DMG-PD)

Velaro stated their disagreement, and again followed up about Inv. 70727, which was well-passed due.

55. The matter was later elevated to Peak6's COO, Danny Rosenthal.

56. The communications devolved from there, with Mr. Rosenthal asserting their belief that they did not have to pay anything for the software they had been using for the past several months.

57. Eventually, and pursuant to the notice and termination terms of the Agreement, Velaro shut down its services to NFS.

58. However, Velaro has recently discovered that NFS/Peak6 did not immediately remove Velaro's JavaScript from the websites of NFS or NFS's third party clients, and believes elements of Velaro's software have been incorporated into NFS/Peak6's own Trident platform.

59. Velaro demanded that NFS/Peak6 remove its code/script from all of its websites and the websites of third parties, as well as from the Trident platform.

60. To date, NFS/Peak6 have not paid, and refuse to pay any portion of Inv. 70727, or the amounts due and owing for years two and three for the third renewed term.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract by Plaintiff against NFS)

61. Plaintiff re-alleges and incorporates by reference into this cause of action each allegation set forth in each paragraph of this Complaint.

62. The Agreement and License Agreement, together, constitute a valid and enforceable contracts as between Velaro and NFS.

63. Velaro performed all obligations owed by it to NFS, except those that were not due or excused.

64. NFS breached its contract with Velaro by failing and refusing to pay Inv. 70727, and any further sums due pursuant to the Agreement and License Agreement.

65. NFS further breached its contract with Velaro by repudiating its terms and unequivocally refusing to perform on it going forward.

66. Velaro was damaged by NFS's breach in the amount of $115,142.40, representing the service fees owed under the contract for the three year term.

## SECOND CLAIM FOR RELIEF

### (Account Stated by Plaintiff against NFS)

67. Plaintiff re-alleges and incorporates by reference into this cause of action each allegation set forth in each paragraph of this Complaint.

68. In the alternative, and at a minimum, NFS owes money to Velaro on an account stated.

69. NFS owed Velaro money from previous financial transactions arising from the Agreement.

70. Inv. 70727 constituted a statement of the account accrued between NFS and Velaro as of January 31, 2020.

71. NFS, by their words and conduct, acquiesced to Inv. 70727, by failing to challenge its correctness within a reasonable time.

72. By their acquiescence, NFS promised to pay the amount stated on Inv. 70727.

73. NFS has not paid the amount stated on Inv. 70727.

74. In the alternative, and at a minimum, NFS owes Velaro $38,380.80 upon Inv. 70727.

## THIRD CLAIM FOR RELIEF

### (Services Rendered by Plaintiff against NFS)

75. Plaintiff re-alleges and incorporates by reference into this cause of action each allegation set forth in each of paragraphs 1 through 60 of this Complaint.

76. In the alternative, if the Agreement did not auto renew, NFS requested, by its words and conduct, that Velaro perform services on behalf of NFS.

77. Velaro has not been paid for the services;

78. The reasonable value of the services prior to shut-off of those services is at least $58,490.25.

## FOURTH CLAIM FOR RELIEF

### (Constructive Fraud by Plaintiff against NFS)

79. Plaintiff re-alleges and incorporates by reference into this cause of action each allegation set forth in each of paragraphs 1 through 60 of this Complaint.

80. Pursuant to the License Agreement, a confidential relationship existed as between Velaro and NFS.

81. The confidential relationship between Velaro and NFS prohibited NFS from using, sharing, or distributing Velaro's software, script, and other intellectual property with third parties, or appropriating that intellectual property for NFS's own use.

82. Velaro is informed and believes, and thereon alleges NFS breached its duty to Velaro by transmitting Velaro's software, script, and intellectual property to third parties, and by incorporating it into the Trident system.

83. Velaro is informed and believes, and thereon alleges that starting in early 2019, NFS acted with the intent to deceive Velaro, giving the impression that intended to keep moving forward with the Agreement, while secretly planning to migrate off of Velaro's system onto an in-house system they were developing.

84. Velaro relied on NFS's putative continued good faith performance, to Velaro's detriment, in an amount subject to proof at trial. Specifically, Velaro allowed its own infrastructure contracts to renew, and allowed NFS to continue to use its software, script, and intellectual property, rather than terminating service.

85. NFS's actions were fraudulent, malicious, and oppressive, entitling Velaro to exemplary damages pursuant to Cal. Civ. Code § 3294, in an amount subject to proof at trial.

## FIFTH CLAIM FOR RELIEF

## (Aiding and Abetting CONSTRUCTIVE Fraud by Plaintiff against Peak6, LLC and Peak6, LP)

86. Plaintiff re-alleges and incorporates by reference into this cause of action each allegation set forth in each of paragraphs 1 through 60 and 71 through 77 of this Complaint.

87. Velaro is informed and believes that starting in early 2019, Peak6 conspired with NFS to dupe Velaro into extending its services while NFS migrated to a new system, and actively facilitated the same.

88. In fact, it was often Peak6's management and in-house counsel who provided cover to NFS, while "negotiating" with Velaro, all in an attempt to delay shut down of Velaro's services.

89. Peak6's actions were a substantial factor in causing the aforementioned harm to Velaro.

90. Peak6's actions were fraudulent, malicious, and oppressive, entitling Velaro to exemplary damages pursuant to Cal. Civ. Code § 3294, in an amount subject to proof at trial.

## SIXTH CLAIM FOR RELIEF

## (Copyright Infringement by Plaintiff against NFS, Peak6, LP and Peak6, LLC)

91. Plaintiff re-alleges and incorporates by reference into this cause of action each allegation set forth in paragraphs 1 through 60 of this Complaint.

92. Velaro owns the copyrights in the code and script that makes up its software services (the "Copyrights").

93. The Copyrights are registered with the United States Copyright office as "Velaro Livechat v20.5.15," Registration Number TX 8-871-526.

94. In the alternative, to the extent the Agreement did not auto-renew (as argued by NFS and Peak6), NFS copied and used the Copyrights without a license to do so, thereby infringing on Velaro's copyrights.

95. Additionally, NFS distributed or installed Velaro's software and script on the websites or systems of third parties, thereby exceeding the scope of any license they were granted, again infringing on Velaro's Copyrights.

96. The use of the software and script by those third parties also infringes on the Copyrights.

97. Velaro is informed and believes NFS directly benefitted financially from those third parties' use of the software and script, and that NFS had a right and ability to supervise or control those parties infringing activity.

98. Additionally, Velaro is informed and believes NFS knew of the infringing activity of those third parties, and intentionally induced and/or contributed to that activity, going so far as to facilitate it by helping those third parties install and use that software and script.

99. Velaro is informed and believes agents of Peak6 not only knew of NFS's use of the software and script covered by the Copyrights, but advised, encouraged, and directed NFS to continue using the intellectual property, even after Peak6 took the position that the Agreement had expired and that no license agreement was in place.

100. Accordingly, Peak6 intentionally induced and/or materially contributed to NFS's infringing activity.

101. Additionally, Peak6 benefitted financially from NFS's infringing activity.

102. Peak6 had the right and ability to supervise and control NFS's infringing activity.

103. Peak6 failed to exercise its right to stop NFS's infringing activity.

104. Additionally, Velaro is informed and believes NFS and Peak6 conspired to, and did in fact copy and incorporate code from Velaro's copyrighted software and script into NFS's new Trinity system, creating an unauthorized derivative work from the Copyrights.

105. NFS and Peak6's infringement on the Copyrights harmed Velaro.

106. NFS and Peak6 profited from infringing on the Copyrights.

107. NFS and Peak6's infringement on the Copyrights was knowing, willful, and intentional.

108. Velaro is entitled to either its actual damages, disgorgement of profits, or statutory damages from NFS and Peak6, and will elect its remedy at the appropriate time.

## SEVENTH CLAIM FOR RELIEF

**(Declaratory Relief by Plaintiff against all Defendants)**

109. Plaintiff re-alleges and incorporates by reference into this cause of action each allegation set forth in each paragraph of this Complaint.

110. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and obligations under the Agreement, Licensing Agreement, and the Copyrights.

111. Plaintiff desires a judicial determination of the parties respective rights under the Agreement, Licensing Agreement, and the Copyrights.

112. Plaintiff also desires a judicial determination that the Agreement did auto-renew for an additional three year term from January 31, 2020, through January 30, 2023.

113. Alternatively, if the Court finds that the Agreement did not auto-renew, Plaintiff desires a judicial determination that Defendants' use of Plaintiff's copyrighted material after January 31, 2020, infringed on Plaintiff's copyrights.

114. Such a declaration is necessary and appropriate at this time so Plaintiff may ascertain its rights and obligations regarding past profits derived from the Copyrights, as well as future licensing and use of the Copyrights.

/ / /

/ / /

/ / /

15
FIRST AMENDED COMPLAINT
(Case No.: 2:20-CV-05078-DMG-PD)

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For general damages in an amount according to proof at trial;
2. For special damages in an amount according to proof at trial;
3. For the reasonable value of the services provided to NFS by Velaro;
4. For Statutory Damages pursuant to 17 U.S.C. § 504;
5. For exemplary damages pursuant to Civil Code § 3294 in an amount according to proof at trial;
6. For imposition of a constructive trust on Defendants, and DOES 1-10;
7. For reasonable attorney's fees pursuant to 17 U.S.C. § 505;
8. For an injunction prohibiting Defendants' use of the Copyrights, and directing Defendants to remove all traces of the software and script from their systems;
9. For costs of suit incurred herein; and
10. For any other and further relief as the Court deems just and proper.

Dated: September 11, 2020                                  ATABEK & ASSOCIATES, P.C.

By:   */s/ Jon A. Atabek*
         JON A. ATABEK

         Attorneys for Plaintiff
         VELARO, INC.

## JURY DEMAND

**TO THE COURT, PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff requests a trial by jury on all matters triable to a jury.

Dated: September 11, 2020         ATABEK & ASSOCIATES, P.C.

By: */s/ Jon A. Atabek*
JON A. ATABEK

Attorneys for Plaintiff
VELARO, INC.